GULF OIL CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 22499-82.          Filed July 21, 1986.

J. Waddy Bullion, Emily A. Parker, Sean T. Crimmins, Buford P. Berry, J. Y. Robb III, and Margaret S. Alford, for the petitioner.

Raymond L. Collins and William B. Lowrance, for the respondent.

GOFFE, *Judge*: The Commissioner determined deficiencies in petitioner's Federal income tax for the taxable year 1974 in the amount of $80,813,428 and for the taxable year 1975 in the amount of $166,316,320. Petitioner and respondent, by motion granted on November 10, 1983, agreed that certain issues would be severed and tried at a special trial session, which was held at Dallas, Texas.

One of the group of issues tried was designated by the parties as "Worthless Properties." The issues included are: (1) Whether certain of Gulf's interests in offshore leases were abandoned in the taxable years at issue, thereby giving rise to deductions under section 165;[1] and (2) if such deduction is established, the amount of Gulf's basis in each lease (lease bonus plus geological and geophysical costs, where appropriate) which is properly allocable to such worthless operating mineral interests.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and accompanying exhibits are so found and incorporated herein by reference.

Gulf Oil Corp. (hereinafter referred to as petitioner or Gulf) is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal office in Pittsburgh, Pennsylvania. During the taxable years 1974 and 1975, Gulf and certain of its subsidiary corporations

---

[1] All section references are to the Internal Revenue Code of 1954, and attendant regulations as amended and in effect for the relevant years, and all Rule references are to the Tax Court Rules of Practice and Procedure.

constituted an "affiliated group" as that term is defined in section 1504. Petitioner, directly and through its foreign subsidiaries and affiliates, is engaged in world-wide exploration, development, production, purchase, and transportation of crude oil and natural gas, and in the manufacture, transportation, and marketing of petroleum products.

Petitioner maintained its books of account for the taxable years 1974 and 1975 on the accrual method of accounting using the calendar year as its taxable year. Gulf, as the common parent of an affiliated group of corporations, timely filed consolidated Federal income tax returns for its taxable years 1974 and 1975 on behalf of itself, and certain of its subsidiary corporations, with the Office of the Internal Revenue Service at Pittsburgh, Pennsylvania. On its consolidated corporate tax returns for the taxable years 1974 and 1975, Gulf claimed "abandonments and extraordinary retirements" with respect to properties in the Gulf of Mexico in the amounts of $35,561,455 and $108,108,366, respectively.

The properties at issue are blocks of land in the Gulf of Mexico that have been leased from either the United States or Louisiana because of the value of the underground minerals. The geology of the area varies. A large cenozoic basin covers much of the coastal area of onshore Texas and all of the offshore Texas and Louisiana areas. This cenozoic basin is surrounded by a series of mesozoic basins, which range from the Rio Grande embayment near the Texas-Mexican border, to the East Texas basin north of the Sabine uplift in East Texas, to the Mississippi interior basin, which includes much of southern Mississippi and much of northern Louisiana, and to the eastern part of the Gulf of Mexico and peninsular Florida. The cenozoic basin containing the offshore Louisiana area is much younger and very different structurally from the older mesozoic basins such as the mesozoic basin in the eastern part of the Gulf of Mexico. The main geologic difference between the offshore Louisiana area and the eastern Gulf of Mexico is that in offshore Louisiana there are many thousands of feet of porous potentially hydrocarbon-bearing sands (hereinafter referred to as mineral deposits) alternating with shale, whereas in the eastern Gulf of Mexico the porous sections

that have the potential of containing oil and gas reservoirs are not very numerous but are more concentrated.

To reflect the different underlying geology and potential for mineral production, the Gulf of Mexico is divided by petitioner into a number of "areas." Two such offshore areas are the offshore Louisiana area and the MAFLA offshore area. The offshore Louisiana area is, as the name implies, located off the coast of Louisiana. MAFLA is an acronym for Mississippi, Alabama, and Florida. The MAFLA offshore area is located in the eastern Gulf of Mexico adjacent to these three States. The properties at issue are contained within one or the other of these two areas as detailed below.

Gulf was one of the first companies to explore for oil and gas in the Gulf of Mexico, beginning in the early 1950's. The Gulf of Mexico has been one of the primary exploration areas for Gulf throughout the company's history. Gulf has enjoyed considerable success in its Gulf of Mexico drilling and exploration program conducted within leases of land containing mineral deposits. By 1972, the offshore Louisiana area of the Gulf of Mexico had been the subject of extensive exploration by petroleum companies such as Gulf. Substantial exploration and drilling in the area resulted in the discovery and development of many oil and gas fields. Thus, bidders on new leases in the offshore Louisiana area had production history and geologic control data available to them.

In contrast to the offshore Louisiana area, the MAFLA offshore area was not a developed area immediately prior to the taxable years in issue. The first offshore lease sale in the MAFLA offshore area occurred on December 20, 1973. Prior to that time there had been no opportunity to drill any wells in the area.

All of the leases at issue but West Delta 109, which was obtained from the State of Louisiana, were leased from the Minerals Management Service, which is a Federal agency that administers the granting, development, operation, and surrender of oil and gas leases granted by the United States of America. More particularly, the Minerals Management Service is responsible for leasing and for management of operations offshore in the Gulf of Mexico. When the

Minerals Management Service offered a list of outer continental shelf blocks that were available for leasing, Gulf assigned the block list to the geophysical section of the company. The geophysical section then prepared a structure map showing the potential deposits that might be contained in the block. In the offshore Louisiana area, it was often possible to use a nearby producing field as an analogue by which Gulf could readily determine the probability of producible oil or gas. In the MAFLA offshore area, it was generally necessary for Gulf to look onshore in order to find analogues, which could be used to determine the potential mineral deposits in the block offered for lease. The structure map of potential deposits was turned over to the geological section of the company, which estimated the potential mineral reserves of each of the potential deposits.

To determine how much it would bid for an offshore lease, Gulf started with the basic geologic evaluation, which would allow the estimation of the amount of oil or gas present in the block of land to be leased. Gulf then estimated potential costs for drilling exploratory wells, drilling and completing development wells, and placing the lease into production. Gulf developed a series of geological maps which were turned over to the reservoir engineers for a recommendation as to the bid Gulf should pay for the block in light of the rate of return on investment that Gulf required. The requisite rate of return varied according to the risk of the prospect. The single most important factor in determining how much to bid for an offshore lease was the geologic assessment of risk. For example, for two potential 100-million-barrel prospects, Gulf might be willing to pay $1 million for one which has a low degree of risk and $50 million for the other which has a higher degree of risk. Risk was primarily determined by Gulf's geologists. The final calculation of the amount of Gulf's bid was predicated on an assessment of that risk in light of the data it had accumulated.

The outer continental shelf leases covered only a portion of the Gulf of Mexico and are numbered using the prefix "OCS-G." Additional leases were available from the State of Louisiana under the same procedures as the outer continental shelf leases. Gulf made a geologic evaluation to deter-

mine the potential mineral deposits present and then submitted a bid to the State of Louisiana.

Gulf acquired undivided interests in 23 oil and gas leases located in the offshore Louisiana area and in the MAFLA offshore area, covering the indicated blocks in the designated offshore areas as of the specified effective dates:

OFFSHORE LOUISIANA

| Area | Block | Lease | Date | Gulf's undivided interest |
|---|---|---|---|---|
| East Cameron | 236 | OCS-G 2859 | 12/1/74 | 33.33334% |
| East Cameron | 237 | OCS-G 2860 | 12/1/74 | 33.33333 |
| Garden Banks | 326 | OCS-G 2809 | 9/1/74 | 50 |
| Grand Isle | 88 | OCS-G 2931 | 12/1/74 | 50 |
| Main Pass | 138 | OSC-G 2191 | 10/1/72 | 40 |
| Main Pass | 146 | OSC-G 2195 | 11/1/72 | 50 |
| Ship Shoal | 228 | OSC-G 2333 | 2/1/73 | 50 |
| West Delta | 35-36 | OSC-G 2165 | 10/1/72 | 70 |
| West Delta | 113 | OCS-G 2169 | 11/1/72 | 50 |
| West Delta | 109 | Louisiana State Lease No. 6309 | 5/8/74 | 30⅓ |

MAFLA OFFSHORE AREA

| Area | Block | Lease | Date | Gulf's undivided interest |
|---|---|---|---|---|
| Destin Dome | 122 | OCS-G 2496 | 1/1/74 | 50% |
| Destin Dome | 210 | OCS-G 2483 | 1/1/74 | 25 |
| Destin Dome | 254 | OCS-G 2476 | 1/1/74 | 50 |
| Destin Dome | 255 | OCS-G 2477 | 1/1/74 | 33⅓ |
| Destin Dome | 359 | OCS-G 2467 | 1/1/74 | 33⅓ |
| Destin Dome | 360 | OCS-G 2468 | 1/1/74 | 100 |
| Destin Dome | 404 | OCS-G 2465 | 1/1/74 | 50 |
| Florida Middleground | 252 | OCS-G 2516 | 1/1/74 | 33⅓ |
| St. Petersburg | 99 | OCS-G 2522 | 1/1/74 | 50 |
| St. Petersburg | 100 | OCS-G 2523 | 1/1/74 | 25 |
| Viosca Knoll | 24 | OCS-G 2460 | 1/1/74 | 50 |
| Viosca Knoll | 68 | OCS-G 2454 | 1/1/74 | 33⅓ |
| Viosca Knoll | 74 | OCS-G 2457 | 1/1/74 | 33⅓ |

Except for West Delta 109, the lessor for the leases identified above (hereinafter collectively referred to as the leases in question and individually referred to by area and block), was the United States of America. The lessor for West Delta 109 was the State of Louisiana. The primary

term of each of the leases in question was 5 years from the effective date of the lease.

Gulf (together with the other co-owners of the leases in question), as a successful bidder for the leases in question, was required to pay a cash bonus for each such lease. The bonus costs of the leases in question were very high, averaging over $15 million per lease and ranging up to over $60 million for a single lease. The following chart shows the cash bonus paid for each of the leases in question and Gulf's share of such bonus:

OFFSHORE LOUISIANA

| Lease area and block | Bonus | Gulf's undivided interest | Gulf's share of bonus[1] |
|---|---|---|---|
| East Cameron 236 | $27,972,000.00 | 33.33334% | $9,324,002 |
| East Cameron 237 | 6,933,000.00 | 33.33333 | 2,311,000 |
| Garden Banks 326 | 1,790,000.00 | 50 | 895,000 |
| Grand Isle 88 | 7,982,000.00 | 50 | 3,991,000 |
| Main Pass 138 | 22,233,000.00 | 40 | 8,893,200 |
| Main Pass 146 | 11,133,000.00 | 50 | 5,566,500 |
| Ship Shoal 228 | 6,351,760.00 | 50 | 3,175,880 |
| West Delta 35-36 | 41,400,000.00 | 70 | 28,980,000 |
| West Delta 113 | 1,126,666.66 | 50 | 563,333 |
| West Delta 109 | 7,713,000.00 | 33⅓ | 2,571,000 |

[1]Rounded to the nearest dollar.

MAFLA OFFSHORE AREA

| Lease area and block | Bonus | Gulf's undivided interest | Gulf's share of bonus[1] |
|---|---|---|---|
| Destin Dome 122 | $8,181,000 | 50% | $4,090,500 |
| Destin Dome 210 | 61,166,000 | 25 | 15,291,500 |
| Destin Dome 254 | 5,777,000 | 50 | 2,888,500 |
| Destin Dome 255 | 11,566,000 | 33⅓ | 3,855,333 |
| Destin Dome 359 | 8,111,000 | 33⅓ | 2,703,667 |
| Destin Dome 360 | 36,067,000 | 100 | 36,067,000 |
| Destin Dome 404 | 35,555,000 | 50 | 17,777,500 |
| Florida | | | |
| Middleground 252 | 5,655,000 | 33⅓ | 1,885,000 |
| St. Petersburg 99 | 6,166,000 | 33⅓ | 2,055,333 |
| St. Petersburg 100 | 15,777,000 | 25 | 3,944,250 |
| Viosca Knoll 24 | 13,731,000 | 50 | 6,865,500 |
| Viosca Knoll 68 | 17,171,000 | 33⅓ | 5,723,667 |
| Viosca Knoll 74 | 7,555,000 | 33⅓ | 2,518,333 |

[1]Rounded to the nearest dollar.

Except for West Delta 109, each of the leases in question, all of which covered an area of between 5,000 and 5,760 acres, provided for a yearly delay rental of $3 per acre, resulting in a yearly delay rental of less than $20,000 for each such lease. For West Delta 109 (the Louisiana State lease), the yearly delay rental was one-half of the bonus payment, resulting in a yearly delay rental of approximately $3,856,500 for the lease. Gulf paid delay rentals to the Minerals Management Service or the State of Louisiana for each of the leases during the taxable year at issue. Throughout the taxable years at issue, Gulf felt that each of the leases had the potential of containing at least one mineral deposit with commercial value. Payment of the delay rentals caused ownership of the leases to be retained throughout the primary term and allowed Gulf to complete its exploration of the leased property.

At or shortly after the time that Gulf acquired its interest in each of the leases in question, it made a determination of the potential mineral deposits that, in its opinion, were contained in each such lease. The following chart shows the number of potential mineral deposits, as determined by Gulf with respect to each such lease, and the horizontal intervals within which such potential mineral deposits were located. Gulf determined such mineral deposits no later than the date shown in parentheses with respect to each lease. The mineral deposits as determined by Gulf are labeled D1, D2, D3, and so on, in order of increasing depth.

OFFSHORE LOUISIANA

| Lease area and block | Depth interval (in feet) | Potential deposits |
|---|---|---|
| East Cameron 236 | 6,000- 7,000 | 3 (D1, D2, D3) |
| (Dec. 6, 1974) | 7,000- 8,000 | 3 (D4, D5, D6) |
| | 8,000- 9,000 | 2 (D7, D8) |
| | 9,000-10,000 | 4 (D9, D10, D11, D12) |
| | 10,000-11,000 | 2 (D13, D14) |
| | 11,000-12,000 | 2 (D15, D16) |
| | 12,000-13,000 | 2 (D17, D18) |
| | 13,000-14,000 | 1 (D19) |
| | Total | 19 |
| East Cameron 237 | 6,000- 7,000 | 3 (D1, D2, D3) |
| (Dec. 6, 1974) | 7,000- 8,000 | 3 (D4, D5, D6) |
| | 8,000- 9,000 | 2 (D7, D8) |

| Lease area and block | Depth interval (in feet) | Potential deposits |
|---|---|---|
| | 9,000-10,000 | 4 (D9, D10, D11, D12) |
| | 10,000-11,000 | 2 (D13, D14) |
| | 11,000-12,000 | 2 (D15, D16) |
| | 12,000-13,000 | 2 (D17, D18) |
| | 13,000-14,000 | 1 (D19) |
| | Total | 19 |
| Garden Banks 326 (Dec. 6, 1974) | 3,000- 4,000 | 2 (D1, D2) |
| | 4,000- 5,000 | 2 (D3, D4) |
| | 5,000- 6,000 | 2 (D5, D6) |
| | Total | 6 |
| Grand Isle 88 (Dec. 6, 1974) | 6,000- 7,000 | 7 (D1, D2, D3, D4, D5, D6, D7) |
| | 7,000- 8,000 | 5 (D8, D9, D10, D11, D12) |
| | 8,000- 9,000 | 6 (D13, D14, D15, D16, D17, D18) |
| | 9,000-10,000 | 4 (D19, D20, D21, D22) |
| | 10,000-11,000 | 5 (D23, D24, D25, D26, D27) |
| | 11,000-12,000 | 5 (D28, D29, D30, D31, D32) |
| | 12,000-13,000 | 4 (D33, D34, D35, D36) |
| | 13,000-14,000 | 3 (D37, D38, D39) |
| | Total | 39 |
| Main Pass 138 (Dec. 15, 1972) | 5,000- 6,000 | 12 (D1, D2, D3, D4, D5, D6, D7, D8, D9, D10 D11, D12) |
| | 6,000- 7,000 | 11 (D13, D14, D15, D16, D17, D18, D19, D20, D21, D22, D23) |
| | 7,000- 8,000 | 8 (D24, D25, D26, D27, D28, D29, D30, D31) |
| | 8,000- 9,000 | 4 (D32, D33, D34, D35) |
| | 9,000- 9,500 | 1 (D36) |
| | Total | 36 |
| Main Pass 146 (Dec. 15, 1972) | 5,000- 6,000 | 12 (D1, D2, D3, D4, D5, D6, D7, D8, D9, D10, D11, D12) |
| | 6,000- 7,000 | 11 (D13, D14, D15, D16, D17, D18, D19, D20, D21, D22, D23) |
| | 7,000- 8,000 | 8 (D24, D25, D26, D27, D28, D29, D30, D31) |
| | 8,000- 9,000 | 4 (D32, D33, D34, D35) |
| | 9,000- 9,500 | 1 (D36) |
| | Total | 36 |

| Lease area and block | Depth interval (in feet) | Potential deposits |
|---|---|---|
| Ship Shoal 228 | 5,000- 6,000 | 2 (D1, D2) |
| (Jan. 19, 1973) | 6,000- 7,000 | 0 |
| | 7,000- 8,000 | 1 (D3) |
| | 8,000- 9,000 | 1 (D4) |
| | 9,000-10,000 | 2 (D5, D6) |
| | 10,000-11,000 | 0 |
| | 11,000-12,000 | 0 |
| | 12,000-13,000 | 0 |
| | 13,000-14,000 | 1 (D7) |
| | 14,000-15,000 | 1 (D8) |
| | 15,000-16,000 | 2 (D9, D10) |
| | Total | 10 |
| West Delta 35-36 | 8,000- 9,000 | 1 (D1) |
| (Dec. 15, 1972) | 9,000-13,000 | 2 (D2, D3) |
| | 13,000-14,000 | 4 (D4, D5, D6, D7) |
| | 14,000-15,000 | 4 (D8, D9, D10, D11) |
| | 15,000-16,000 | 4 (D12, D13, D14, D15) |
| | 16,000-17,500 | 3 (D16, D17, D18) |
| | Total | 18 |
| West Delta 113 | 7,500- 8,500 | 5 (D1, D2, D3, D4, D5) |
| (Dec. 15, 1972) | 8,500- 9,500 | 7 (D6, D7, D8, D9, D10, D11, D12) |
| | 9,500-10,500 | 6 (D13, D14, D15, D16, D17, D18) |
| | 10,500-11,500 | 6 (D19, D20, D21, D22, D23, D24) |
| | 11,500-12,500 | 7 (D25, D26, D27, D28, D29, D30, D31) |
| | 12,500-13,500 | 6 (D32, D33, D34, D35, D36, D37) |
| | Total | 37 |
| West Delta 109 | 3,000- 4,000 | 1 (D1) |
| (Oct. 27, 1974) | 4,000- 5,000 | 3 (D2, D3, D4) |
| | 5,000- 6,000 | 3 (D5, D6, D7) |
| | 6,000- 7,000 | 3 (D8, D9, D10) |
| | 7,000- 8,000 | 4 (D11, D12, D13, D14) |
| | 8,000- 9,000 | 5 (D15, D16, D17, D18, D19) |
| | 9,000-10,000 | 2 (D20, D21) |
| | 10,000-11,000 | 4 (D22, D23, D24, D25) |
| | 11,000-12,000 | 4 (D26, D27, D28, D29) |
| | 12,000-13,000 | 4 (D30, D31, D32, D33) |
| | 13,000-14,000 | 1 (D34) |
| | 14,000-15,000 | 1 (D35) |
| | Total | 35 |

## MAFLA OFFSHORE AREA

| Lease area and block | Depth interval (in feet) | Potential deposits |
|---|---|---|
| Destin Dome 122 | 3,500- 6,000 | 3 (D1, D2, D3) |
| (Feb. 20, 1974) | 6,000-15,700 | 3 (D4, D5, D6) |
| | 15,700-18,500 | 2 (D7, D8) |
| | Total | 8 |
| Destin Dome 210 | 3,500- 6,000 | 3 (D1, D2, D3) |
| (Feb. 20, 1974) | 6,000-15,700 | 3 (D4, D5, D6) |
| | 15,700-18,500 | 2 (D7, D8) |
| | Total | 8 |
| Destin Dome 254 | 3,500- 6,000 | 3 (D1, D2, D3) |
| (Feb. 20, 1974) | 6,000-15,700 | 3 (D4, D5, D6) |
| | 15,700-18,500 | 2 (D7, D8) |
| | Total | 8 |
| Destin Dome 255 | 3,500- 6,000 | 3 (D1, D2, D3) |
| (Feb. 20, 1974) | 6,000-15,700 | 3 (D4, D5, D6) |
| | 15,700-18,500 | 2 (D7, D8) |
| | Total | 8 |
| Destin Dome 359 | 8,000- 8,500 | 2 (D1, D2) |
| (Feb. 20, 1974) | 8,500-17,000 | 4 (D3, D4, D5, D6) |
| | Total | 6 |
| Destin Dome 360 | 8,000- 8,500 | 2 (D1, D2) |
| (Feb. 20, 1974) | 8,500-17,000 | 4 (D3, D4, D5, D6) |
| | Total | 6 |
| Destin Dome 404 | 8,000- 8,500 | 2 (D1, D2) |
| (Feb. 20, 1974) | 8,500-17,000 | 4 (D3, D4, D5, D6) |
| | Total | 6 |
| Florida | 3,000- 5,600 | 1 (D1) |
| Middleground 252 | 5,600-13,400 | 1 (D2) |
| (Feb. 20, 1974) | 13,400-14,000 | 1 (D3) |
| | Total | 3 |
| St. Petersburg 99 | 6,500- 7,300 | 1 (D1) |
| (Feb. 20, 1974) | 7,300-16,000 | 1 (D2) |
| | 16,000-18,000 | 1 (D3) |
| | Total | 3 |
| St. Petersburg 100 | 6,500- 7,300 | 1 (D1) |
| (Feb. 20, 1974) | 7,300-16,000 | 1 (D2) |
| | 16,000-18,000 | 1 (D3) |
| | Total | 3 |
| Viosca Knoll 24 | 4,000- 5,000 | 1 (D1) |
| (Feb. 20, 1974) | 5,000- 6,000 | 1 (D2) |
| | 6,000- 7,200 | 1 (D3) |
| | 7,200-20,000 | 1 (D4) |
| | Total | 4 |
| Viosca Knoll 68 | 4,000- 5,000 | 1 (D1 |
| (Feb. 20, 1974) | 5,000- 6,000 | 1 (D2) |

| Lease area and block | Depth interval (in feet) | Potential deposits |
|---|---|---|
| | 6,000- 7,200 | 1 (D3) |
| | 7,200-20,000 | 1 (D4) |
| | Total | 4 |
| Viosca Knoll 74 | 3,000- 4,000 | 1 (D1) |
| (Feb. 20, 1974) | 4,000- 5,000 | 1 (D2) |
| | 5,000- 6,500 | 1 (D3) |
| | 6,500-20,000 | 1 (D4) |
| | Total | 4 |

Gulf made an election under section 614(b)(2) to treat each of the potential mineral deposits as an operating mineral interest and as a separate property.[2]

Gulf allocated its basis (composed of the bonus payment plus geological and geophysical costs in each lease, where appropriate) to and among the mineral deposits that Gulf, in its opinion, had determined were contained in such lease. Each mineral deposit anticipated by Gulf to be within each lease located off the shore of Louisiana was allocated an identical percentage and amount of Gulf's basis in the particular lease. The number of potential mineral deposits as determined by Gulf to be within each lease off the shore of Louisiana, the percentage and amount of Gulf's basis in the underlying lease allocated to the mineral deposits, and the date of the allocations, are as follows:

### OFFSHORE LOUISIANA

| Lease area and block | Potential deposits | Percentage of basis | Amount of basis[1] |
|---|---|---|---|
| East Cameron 236 (Dec. 6, 1974) | 19 | $5\tfrac{5}{19}\%$ | $490,737 |
| East Cameron 237 (Dec. 6, 1974) | 19 | $5\tfrac{5}{19}$ | 121,632 |
| Garden Banks 326 (Feb. 20, 1974) | 6 | $16\tfrac{1}{6}$ | 149,167 |
| Grand Isle 88 (Dec. 6, 1974) | 39 | $2\tfrac{22}{39}$ | 102,333 |
| Main Pass 138 (Dec. 15, 1972) | 36 | $2\tfrac{7}{9}$ | 247,033 |
| Main Pass 146 | 36 | $2\tfrac{7}{9}$ | 154,625 |

(Footnote at end of table.)

---

[2]The parties stipulated that petitioner elected this treatment of the potential mineral deposits contained in the horizontal strata of each lease. No evidence of such an election is contained within petitioner's returns for the taxable years 1974 or 1975.

| Lease area and block | Potential deposits | Percentage of basis | Amount of basis[1] |
|---|---|---|---|
| (Dec. 15, 1972) | | | |
| Ship Shoal 228 | 10 | 10% | $329,035 |
| (Jan. 19, 1973) | | | |
| West Delta 35-36 | 18 | $5\frac{5}{9}$ | 1,610,200 |
| (Dec. 15, 1972) | | | |
| West Delta 113 | 37 | $2\frac{23}{37}$ | 15,225 |
| (Dec. 15, 1972) | | | |
| West Delta 109 | 35 | $2\frac{6}{7}$ | 74,247 |
| (Dec. 15, 1972) | | | |

[1]Rounded to the nearest dollar.

In contrast, the potential mineral deposits within the MAFLA offshore area leases were valued according to relative estimated value. This unequal allocation was felt to be more appropriate due to the uneven distribution of the deposits and greater potential reserves within the deposits. The percentage and amount of petitioner's basis in each of the leases located in the MAFLA offshore area that Gulf allocated to each of the potential mineral deposits within the horizontal strata, and the date of such allocation, are:

| Lease area and block | | Potential deposits | Percentage of basis | Amount of basis[1] |
|---|---|---|---|---|
| Destin Dome 122 | | D1 | 5% | $204,525 |
| (Feb. 20, 1974) | | D2 | 5 | 204,525 |
| | | D3 | 30 | 1,227,150 |
| | | D4 | 5 | 2 04,525 |
| | | D5 | 10 | 409,050 |
| | | D6 | 5 | 204,525 |
| | | D7 | 30 | 1,227,150 |
| | | D8 | 10 | 409,050 |
| | Total | 8 | 100 | 4,090,500 |
| Destin Dome 210 | | D1 | 5 | $764,575 |
| (Feb. 20, 1974) | | D2 | 5 | 764,575 |
| | | D3 | 30 | 4,587,450 |
| | | D4 | 5 | 764,575 |
| | | D5 | 10 | 1,529,150 |
| | | D6 | 5 | 764,575 |
| | | D7 | 30 | 4,587,450 |
| | | D8 | 10 | 1,529,150 |
| | Total | 8 | 100 | 15,291,500 |
| Destin Dome 254 | | D1 | 5 | $144,425 |
| (Feb. 20, 1974) | | D2 | 5 | 144,425 |
| | | D3 | 30 | 866,550 |

(Footnotes at end of table.)

| Lease area and block | | Potential deposits | Percentage of basis | Amount of basis[1] |
|---|---|---|---|---|
| | | D4 | 5% | $144,425 |
| | | D5 | 10 | 288,850 |
| | | D6 | 5 | 866,550 |
| | | D7 | 30 | 866,550 |
| | | D8 | 10 | 288,850 |
| | Total | 8 | 100 | [2]3,610,625 |
| Destin Dome 255 | | D1 | 5 | 192,767 |
| (Feb. 20, 1974) | | D2 | 5 | 192,767 |
| | | D3 | 30 | 1,156,600 |
| | | D4 | 5 | 192,767 |
| | | D5 | 10 | 385,533 |
| | | D6 | 5 | 192,767 |
| | | D7 | 30 | 1,156,600 |
| | | D8 | 10 | 385,533 |
| | Total | 8 | 100 | 3,855,334 |
| Destin Dome 359 | | D1 | 3 | 81,110 |
| (Feb. 20, 1974) | | D2 | 7 | 189,257 |
| | | D3 | 5 | 135,183 |
| | | D4 | 5 | 135,183 |
| | | D5 | 50 | 1,351,833 |
| | | D6 | 30 | 811,100 |
| | Total | 6 | 100 | 2,703,666 |
| Destin Dome 360 | | D1 | 10 | 3,606,700 |
| (Feb. 20, 1974) | | D2 | 20 | 7,213,400 |
| | | D3 | 10 | 3,606,700 |
| | | D4 | 10 | 3,606,700 |
| | | D5 | 30 | 10,820,100 |
| | | D6 | 20 | 7,213,400 |
| | Total | 6 | 100 | 36,067,000 |
| Destin Dome 404 | | D1 | 5 | 888,875 |
| (Feb. 20, 1974) | | D2 | 15 | 2,666,625 |
| | | D3 | 5 | 888,875 |
| | | D4 | 5 | 888,875 |
| | | D5 | 45 | 7,999,875 |
| | | D6 | 25 | 4,444,375 |
| | Total | 6 | 100 | 17,777,500 |
| Florida | | D1 | 25 | 471,250 |
| Middleground 252 | | D2 | 50 | 942,500 |
| (Feb. 20, 1974) | | D3 | 25 | 471,250 |
| | Total | 3 | 100 | 1,885,000 |
| St. Petersburg 99 | | D1 | 25 | 513,833 |
| (Feb. 20, 1974) | | D2 | 50 | 1,027,667 |
| | | D3 | 25 | 513,833 |
| | Total | 3 | 100 | 2,055,333 |

| Lease area and block | | Potential deposits | Percentage of basis | Amount of basis[1] |
|---|---|---|---|---|
| St. Petersburg 100 | | D1 | 25% | $986,063 |
| (Feb. 20, 1974) | | D2 | 50 | 1,972,125 |
| | | D3 | 25 | 986,063 |
| | Total | 3 | 100 | 3,944,251 |
| Viosca Knoll 24 | | D1 | 5 | 359,872 |
| (Feb. 20, 1984) | | D2 | 80 | 5,534,259 |
| | | D3 | 5 | 359,873 |
| | | D4 | 10 | 705,021 |
| | Total | 4 | 100 | 6,959,025 |
| Viosca Knoll 68 | | D1 | 5 | 297,154 |
| (Feb. 20, 1974) | | D2 | 80 | 4,607,216 |
| | | D3 | 5 | 297,156 |
| | | D4 | 10 | 584,491 |
| | Total | 4 | 100 | 5,786,017 |
| Viosca Knoll 74 | | D1 | 5 | 125,917 |
| (Feb. 20, 1974) | | D2 | 80 | 2,014,667 |
| | | D3 | 5 | 125,917 |
| | | D4 | 10 | 251,833 |
| | Total | 4 | 100 | 2,518,334 |

[1] Rounded to the nearest dollar.

[2] Although this figure differs from the total basis stipulated for Destin Dome 254, in the amount of $2,888,500, the stipulated figure is clearly a clerical error.

The following chart shows wells that were drilled upon the leases in question or upon other leases during or prior to the taxable years in issue, the lease upon which each well was drilled, the date each well was spudded, the total depth of each well, and the date upon which such well was plugged and abandoned. Gulf participated in the drilling of each of the wells shown in the chart other than MO 996 MOBIL #1.

| Well | Lease drilled | Spud date | Total depth (in feet) | Date plugged and abandoned |
|---|---|---|---|---|
| DD 166 SUN #1 | [1]OCS-G 2490 | 10/24/74 | 17,608 | 3/06/75 |
| DD 360 GULF #1 | OCS-G 2468 | 4/21/75 | 20,988 | 10/02/75 |
| EC 236 PENZOIL #1 | OCS-G 2859 | 12/22/74 | 13,500 | 2/04/75 |
| FM 252 TEXACO #1 | OCS-G 2516 | 9/22/74 | 15,660 | 1/26/75 |
| GB 326 GULF #1 | OCS-G 2809 | 8/03/75 | 1,616 | 8/08/75 |
| GB 326 GULF #2 | OCS-G 2809 | 8/10/75 | 6,738 | 9/14/75 |
| GI 88 GULF #1 | OCS-G 2931 | 4/14/75 | 12,505 | 7/02/75 |
| MO 996 MOBIL #1 | [1]OCS-G 2442 | 8/03/74 | 5,705 | 9/13/74 |
| MP 138 GULF #1 | OCS-G 2191 | 10/31/72 | 7,976 | 11/26/72 |
| MP 138 GULF #2 | OCS-G 2191 | 11/26/72 | 7,510 | 12/10/72 |
| MP 138 GULF #3 | OCS-G 2191 | 12/25/72 | 9,500 | 1/19/73 |
| MP 138 GULF #4 | OCS-G 2191 | 1/20/73 | 7,500 | 2/02/73 |

(Footnotes at end of table.)

| Well | Lease drilled | Spud date | Total depth (in feet) | Date plugged and abandoned |
|---|---|---|---|---|
| PM 138 SKELLY #5 | OCS-G 2191 | 5/04/75 | 11,347 | 6/12/75 |
| MP 146 GULF #B-9 | [1]OCS-G 2195 | 12/20/73 | 12,975 | 6/19/74 |
| SP 100 TEXACO #1 | OCS-G 2523 | 1/27/75 | 17,388 | 5/26/75 |
| SS 228 CHEVRON #1 | OCS-G 2333 | 3/11/74 | 16,000 | 5/06/74 |
| VK 23 CHEVRON #1 | [1]OCS-G 2459 | 7/24/74 | 6,039 | 8/20/74 |
| VK 23 CHEVRON #2 | OCS-G 2459 | 8/07/74[2] | N/A | 11/25/75[3] |
| WD 35-36 GULF #1 | OCS-G 2165 | 10/20/72 | 17,000 | 2/19/73 |
| WD 35-36 GULF #2 | OCS-G 2165 | 8/14/73 | 15,700 | (4) |
| WD 35-36 GULF #3 | OCS-G 2165 | 11/20/73 | 16,065 | (5) |
| WD 35-36 GULF #4 | OCS-G 2165 | 2/06/74 | 15,467 | (6) |
| WD 109 CHEVRON #1 | LA #6309 | 6/15/74 | 14,000 | 8/06/74 |
| WD 109 CHEVRON #2 | LA #6309 | 4/25/75 | 13,050 | 6/21/75 |
| WD 113 GULF #1 | OCS-G 2169 | 7/05/75 | 11,500 | 7/27/75 |

[1]Not one of the leases in question.
[2]Well located on this date, but well was never spudded.
[3]Well abandoned prior to drilling.
[4]Suspended 11/18/73; completed 11/14/74 as Dry Gas well.
[5]Suspended 2/5/74; completed 11/20/74 as Dual Dry Gas well.
[6]Suspended 3/31/74; completed 11/17/74 as Dry Gas well.

The following are the potential mineral deposits contained within the leases in question that were identified by petitioner as separate operating mineral interests, for which Gulf claimed deductions on the grounds that they became worthless in 1974; the depth of the well or wells that were drilled upon the leases in question or upon other leases; and the amount of the deductions claimed on petitioner's return for the taxable years 1974:

### OFFSHORE LOUISIANA

Lease area and block: Ship Shoal 228
Deposits for which deductions claimed: D1 through D6
Well: SS 228 CHEVRON #1 (Total depth: 16,000')
Deductions claimed (1974): $1,974,169

Lease area and block: West Delta 35-36
Deposits for which deductions claimed: D6 through D18
Well: WD 35-36 GULF #1 (Total depth: 17,000')
WD 35-36 GULF #2 (Total depth: 15,700')
WD 35-36 GULF #3 (Total depth: 16,065')
WD 35-36 GULF #4 (Total depth: 15,467')
Deductions claimed (1974): $20,932,600

Lease area and block: West Delta 109
Deposits for which deductions claimed: D1 through D25

Well: WD 109 CHEVRON #1 (Total depth: 14,000')
    WD 109 CHEVRON #2 (Total depth: 13,050')
Deductions claimed (1974): $1,856,184

### MAFLA OFFSHORE AREA

Lease area and block: Viosca Knoll 24
Deposits for which deductions claimed: D1 and D2
Well: VK 23 CHEVRON #1 (Total depth: 6,039')
Deductions claimed (1974): $5,894,131

Lease area and block: Viosca Knoll 68
Deposits for which deductions claimed: D1 and D2
Well: VK 23 CHEVRON #1 (Total depth: 6,039')
Deductions claimed (1974): $4,904,371

TOTAL DEDUCTIONS CLAIMED (1974): $35,561,455

The following are the potential mineral deposits contained within the leases in question that were identified by petitioner as separate operating mineral interests, for which Gulf claimed deductions on the grounds that they became worthless in 1975; the depth of well or wells that were drilled upon the leases in question or upon other leases; and the amount of the deductions claimed on petitioner's return for the taxable year 1975:

OFFSHORE LOUISIANA

Lease area and block: East Cameron 236
Deposits for which deductions claimed: D1, D3 through D9,
    D11, D12, and D16 through D19
Well: EC 236 PENZOIL #1 (Total depth: 13,500')
deductions claimed (1975): $6,870,317

Lease area and block: East Cameron 237
Deposits for which deductions claimed: D1 through D18
Well: EC 236 PENZOIL #1 (Total depth: 13,500')
Deductions claimed (1975): $2,189,368

Lease area and block: Garden Banks 326
Deposits for which deductions claimed: D1 through D5
Well: GB 326 GULF #1 (Total depth: 1,616')
    GB 326 GULF #2 (Total depth: 6,738')
Deductions claimed (1975): $745,833

Lease area and block: Grand Isle 88
Deposits for which deductions claimed: D5 through D39
Well: GI 88 GULF #1 (Total depth: 12,505')
Deductions claimed (1975): $3,581,667

Lease area and block: Main Pass 138
Deposits for which deductions claimed: D4 through D31,
    and D33 through D35

Well: MP 138 GULF #1 (Total depth: 7,976')
     MP 138 GULF #2 (Total depth: 7,510')
     MP 138 GULF #3 (Total depth: 9,500')
     MP 138 GULF #4 (Total depth: 7,500')
     MP 138 SKELLY #5 (Total depth: 11,347')
Deductions claimed (1975): $7,658,033

Lease area and block: Main Pass 146
Deposits for which deductions claimed: D5 through D36
Well: MP 146 GULF #B-9 (Total depth: 12,975')
Deductions claimed (1975): $4,948,000

Lease area and block: West Delta 113
Deposits for which deductions claimed: D2 through D37
Well: WD 113 GULF #1 (Total depth: 11,500')
Deductions claimed (1975): $548,108

## MAFLA OFFSHORE AREA

Lease area and block: Destin Dome 122
Deposits for which deductions claimed: D1 through D7
Well: DD 166 SUN #1 (Total depth: 17,608')
Deductions claimed (1975): $3,681,450

Lease area and block: Destin Dome 210
Deposits for which deductions claimed: D1 through D7
Well: DD 166 SUN #1 (Total depth: 17,608')
Deductions claimed (1975): $13,762,350

Lease area and block: Destin Dome 254
Deposits for which deductions claimed: D1 through D7
Well: DD 166 SUN #1 (Total depth: 17,608')
Deductions claimed (1975): $2,599,650

Lease area and block: Destin Dome 255
Deposits for which deductions claimed: D1 through D7
Well: DD 166 SUN #1 (Total depth: 17,608')
Deductions claimed (1975): $3,469,800

Lease area and block: Destin Dome 359
Deposits for which deductions claimed: D2 through D6
Well: DD 360 GULF #1 (Total depth: 20,988')
Deductions claimed (1975): $2,621,990

Lease area and block: Destin Dome 360
Deposits for which deductions claimed: D2 through D6
Well: DD 360 GULF #1 (Total depth: 20,988')
Deductions claimed (1975): $32,460,300

Lease area and block: Destin Dome 404
Deposits for which deductions claimed: D2 through D6
Well: DD 360 GULF #1 (Total depth: 20,988')
Deductions claimed (1975): $16,888,625

Lease area and block: Florida Middleground 252
Deposits for which deductions claimed: D1 and D3
Well: FM 252 TEXACO #1 (Total depth: 15,660')

Deductions claimed (1975): $942,500

Lease area and block: St. Petersburg 99
Deposits for which deductions claimed: D1 and D3
Well: SP 100 TEXACO #1 (Total depth: 17,388')
Deductions claimed (1975): $1,027,666

Lease area and block: St. Petersburg 100
Deposits for which deductions claimed: D1 and D3
Well: SP 100 TEXACO #l (Total depth: 17,388')
Deductions claimed (1975): $1,972,125

Lease area and block: Viosca Knoll 74
Deposits for which deductions claimed: D1 and D2
Well: MO 996 MOBIL #1 (Total depth: 5,705')
Deductions claimed (1975): $2,140,584

TOTAL DEDUCTIONS CLAIMED (1975): $108,108,366

Without production in paying quantities or continuation of drilling, each lease at issue would have automatically expired at the end of its 5-year primary term. When an offshore lease expired by operation of law, the Minerals Management Service recorded that fact and the lease then became available for bid at a subsequent lease sale. In addition to expiration of a lease by operation of law, the Minerals Management Service also accepted the release or relinquishment of offshore leases, but only pursuant to its regulations. The Minerals Management Service accepted relinquishment of an entire offshore lease or an "officially designated subdivision" thereof, but did not accept relinquishment of a horizontal interval, strata, or sands in an offshore lease since such a horizontal division did not constitute an "officially designated subdivision" of an offshore lease. For example, the Minerals Management Service would not have accepted relinquishment of an offshore lease where the relinquishment was limited to all depths below 5,000 feet. The refusal of Minerals Management Service to accept relinquishment of a lessee's interest in a horizontal interval in an offshore lease was based upon regulations that had been in effect since 1954.

Subsequent to the taxable years in issue, Gulf filed a relinquishment of all of its interest for each of the leases in question (except for East Cameron 237, which is presently in production). The following chart shows the date upon which Gulf filed its relinquishment of all of its interest in each lease, the effective date of the cancellation of the lease

(or the date the lease expired, if so indicated), and the date upon which the primary term of the lease expired or would have expired but for such relinquishment or the extension of the lease by production:

## OFFSHORE LOUISIANA

| Lease area and block | Date relinquishment filed | Date lease canceled | Date lease primary term did or would have expired |
|---|---|---|---|
| East Cameron 236 | 01/31/80 | 11/30/79[1] | 11/30/79 |
| East Cameron 237 | See (2) below | See (2) below | 11/30/79 |
| Garden Banks 326 | 08/27/79 | 08/27/79 | 08/31/79 |
| Grand Isle 88 | 11/30/79 | 11/30/79[1] | 11/30/79 |
| Main Pass 138 | 10/03/77 | 09/30/77[1] | 09/30/77 |
| Main Pass 146 | 10/28/77 | 10/28/77 | 10/31/77 |
| Ship Shoal 228 | 08/16/78 | 03/05/78[1] | 03/05/78 |
| West Delta 35-36 | 05/05/83 | 02/17/83[1] | 09/30/77 |
| West Delta 109 | See (3) below | See (3) below | 05/07/79 |
| West Delta 113 | 10/26/76 | 10/26/76 | 10/31/77 |

[1]Lease expired by its own terms.
[2]The lease is presently active, so no relinquishment has been filed and the lease has not been canceled.
[3]Exact dates that relinquishment was filed and lease was canceled are not known. Relinquishment was executed June 21, 1976.

## MAFLA OFFSHORE AREA

| Lease area and block | Date relinquishment filed | Date lease canceled | Date lease primary term did or would have expired |
|---|---|---|---|
| Destin Dome 122 | 12/21/78 | 12/21/78 | 12/31/78 |
| Destin Dome 210 | 03/12/79 | 12/31/78[1] | 12/31/78 |
| Destin Dome 254 | 12/21/78 | 12/21/78 | 12/31/78 |
| Destin Dome 255 | 12/21/78 | 12/21/78 | 12/31/78 |
| Destin Dome 359 | 12/21/78 | 12/21/78 | 12/31/78 |
| Destin Dome 360 | 12/21/78 | 12/21/78 | 12/31/78 |
| Destin Dome 404 | 12/21/78 | 12/21/78 | 12/31/78 |
| Florida Middleground 252 | 12/27/76 | 12/27/76 | 12/31/78 |
| St. Petersburg 99 | 12/17/76 | 12/17/76 | 12/31/78 |
| St. Petersburg 100 | 12/27/76 | 12/27/76 | 12/31/78 |
| Viosca Knoll 24 | 12/21/78 | 12/21/78 | 12/31/78 |
| Viosca Knoll 68 | 12/21/78 | 12/21/78 | 12/31/78 |
| Viosca Knoll 74 | 12/21/78 | 12/21/78 | 12/31/78 |

[1]Lease expired by its own terms.

Gulf's tax department initiated the process that led to the establishment of Gulf's separate property procedures in the Gulf of Mexico. In August and December of 1975, Gulf employees exchanged memoranda clarifying whether percentages or fractions of deposits were to be written off. The abandonment losses to be claimed on petitioner's return for the taxable year 1975 were acknowledged in these memoranda to be independent of actual relinquishment of the leases. The writeoffs of mineral deposits within horizontal strata were solely for tax purposes and each of the leases continued to be maintained on the books of Gulf Oil. Gulf did not inform any person other than its employees of its determination that the mineral deposits were worthless or of their alleged abandonment. Petitioner's returns for the taxable years 1974 and 1975 reflect abandonment losses in bulk without disclosure of the fact that only portions of leases were being deducted as losses sustained due to worthlessness.

Gulf did not dispose of any of the undivided interests that it had acquired in the leases in question by sale, exchange, sublease, or any other form of disposition, during the taxable years in issue. Gulf farmed out limited rights in the leases on East Cameron 237 and in the West Delta 35 and 36 leases. Gulf did not inform the farmees that it had "abandoned" portions of the leases, nor did Gulf disclaim any interest in any of the depth intervals that were farmed out, even though portions of some of these strata had allegedly been written off as worthless and abandoned. Petitioner paid a portion of the development costs as to the farmed-out strata in which mineral deposits were discovered, and also claimed production from a deposit in one strata that it had earlier claimed to have abandoned.

Petitioner claimed "abandonments and extraordinary retirements" with respect to the offshore Louisiana and MAFLA offshore leases in the amounts of $35,561,455 and $108,108,366 on its tax returns for the taxable years 1974 and 1975.[4] These amounts were claimed on the basis of claims of abandonments of mineral deposits within horizontal strata within the leases as specified above. Respondent

---

[4]The total amount of abandonments and extraordinary losses claimed on petitioner's returns for the taxable years 1974 and 1975 were $58,773,716 and $119,994,868, respectively.

determined that the worthlessness of the mineral interests had not been established, and disallowed, in full, the claimed deductions for abandonment of portions of the leases.

## OPINION

The issues for decision are: (1) Whether certain of Gulf's interests in offshore leases were abandoned in the taxable years in issue, thereby giving rise to deductions under section 165; and (2) if such deduction is established, the amount of Gulf's basis in each lease (lease bonus plus geological and geophysical costs, where appropriate) that is properly allocable to such worthless operating minerals interests.

The determinations by the Commissioner in his statutory notice of deficiency are presumptively correct, and petitioner has the burden of disproving each individual adjustment. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a). Petitioner, therefore, bears the burden of proving that a loss was sustained by means of the abandonment of worthless property in the taxable years at issue.

Section 165(a) allows as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. In general, a deductible loss is sustained "during the taxable year in which the loss occurs as evidenced by closed and completed transactions and as fixed by identifiable events occurring in such taxable year." Sec. 1.165-1(d)(1), Income Tax Regs. Losses claimed with respect to nondepreciable property must meet further requirements. Sec. 1.165-2, Income Tax Regs., provides in part:

Sec. 1.165-2. Obsolescence of nondepreciable property.

(a) *Allowance of deduction.* A loss incurred in a business or in a transaction entered into for profit and arising from the sudden termination of the usefulness in such business or transaction of any nondepreciable property, in a case where such business or transaction is discontinued or where such property is permanently discarded from use therein, shall be allowed as a deduction under section 165(a) for the taxable year in which the loss is actually sustained. For this purpose, the taxable year in which the loss is sustained is not necessarily the taxable year in which the overt act of abandonment, or the loss of title to the property, occurs.

Sustained losses deductible under this section have commonly been referred to as abandonment losses to reflect the requirement of an act that evidences an intent to discontinue use or permanently discard nondepreciable property. *A.J. Industries, Inc. v. United States*, 503 F.2d 660 (9th Cir. 1974). The act of abandonment determines the timing of the deduction for abandonment losses, and not the character of the loss. *Yarbro v. Commissioner*, 737 F.2d 479, 486-487 (5th Cir. 1984).

Petitioner and respondent have spent a considerable portion of time and effort at trial, and on brief, on the nature of the property that was claimed as an abandonment loss on petitioner's tax returns for the taxable years 1974 and 1975. Petitioner has conceded that none of the leases at issue were relinquished or terminated in the taxable years at issue. Petitioner, however, alleges that each of the potential mineral deposits established by Gulf's personnel at or shortly after the acquisition of each lease is a separate "property" which is susceptible to abandonment on an individual basis. Respondent disagrees with this definition of "property" and claims that petitioner, in any event, failed to take any action that evidenced an intent to abandon the "properties" whether the properties are the potential mineral deposits within the entire leases or each of the horizontal strata of the leases as petitioner contends.

Section 614(a) defines the term "property" in the context of "mines, wells, and other natural deposits" to be "each separate interest owned by the taxpayer in each mineral deposit in each separate tract or parcel of land." Sec. 1.614-1(a)(1), Income Tax Regs. The term "interest" is defined under section 1.614-1(a)(2), Income Tax Regs., as—

an economic interest in a mineral deposit. See paragraph (b) of sec. 1.611-1. The term includes working or operating interests, royalties, overriding royalties, net profits interest, and, to the extent not treated as loans under section 636, production payments.

The general rule under section 614(a), therefore, is that if a tract or parcel contains two or more economic interests in mineral deposits, a taxpayer's interests in the deposits are correspondingly treated as two or more separate properties. If, however, the taxpayer's economic interests in the deposits contained in a tract or parcel of land constitute

"operating mineral interests" the special rules of section 614(b) apply. The term "operating mineral interests" is defined in section 614(d) which provides:

SEC. 614(d). OPERATING MINERAL INTERESTS DEFINED.—For purposes of this section, the term "operating mineral interest" includes only an interest in respect of which the costs of production of the mineral are required to be taken into account by the taxpayer for purposes of computing the 50 percent limitation provided for in section 613, or would be so required if the mine, well, or other natural deposit were in the production stage.

Accordingly, if the taxpayer's interests in the deposits contained in a tract or parcel of land contains divisible "operating mineral interests" within the definition of section 614(d), then instead of being treated as separate properties under section 614(a), all of the operating mineral interests will generally be treated as a single property under section 614(b)(1), which provides:

SEC. 614(b). SPECIAL RULES AS TO OPERATING MINERAL INTERESTS IN OIL AND GAS WELLS.—In the case of oil and gas wells—

(1) IN GENERAL.—Except as otherwise provided in this subsection—

(A) all of the taxpayer's operating mineral interests in a separate tract or parcel of land shall be combined and treated as one property, and

(B) the taxpayer may not combine an operating mineral interest in one tract or parcel of land with an operating mineral interest in another tract or parcel of land.

Thus, in contrast to the general rule applied to economic interests, which treats each interest as a separate property under section 614(a), the general rule applied to the "operating mineral interests" is aggregation into one property under section 614(b)(1).

Section 614(b)(2), however, permits a taxpayer to make an election with respect to two or more operating mineral interests in a single tract or parcel of land and provides in part:

(2) ELECTION TO TREAT OPERATING MINERAL INTETESTS AS SEPARATE PROPERTIES.—If the taxpayer has more than one operating mineral interest in a single tract or parcel of land, he may elect to treat one or more of such operating mineral interests as separate properties. * * *

The election under section 614(b)(2) in effect permits a taxpayer who has more than one operating mineral interest

in a single tract or parcel of land to elect to have his operating mineral interests come within the separate property rule of section 614(a), even though such operating mineral interests would otherwise be treated as a single property pursuant to section 614(b)(1). The election must be made, at the latest, with the tax return for the first taxable year in which the taxpayer incurs any expenditure for development or operation in connection with the operating mineral interest. Sec. 614(b)(4)(A); sec. 1.614-8(a)(3), Income Tax Regs. The election made for treatment under section 614(b)(2) is effective for all purposes under subtitle A of the Internal Revenue Code. Sec. 614(b)(4)(B). More particularly, the property concepts and definitions embodied in section 614 are applicable to questions concerning deductibility under section 165. *American Smelting & Refining Co. Consolidated v. United States*, 191 Ct. Cl. 307, 423 F.2d 277, 284-285 (1970).

In this case petitioner argues that each of the deposits within the horizontal strata containing the potential for production of minerals is an operating mineral interest for which an election has been made for treatment as a separate property pursuant to section 614(b)(2). Petitioner in essence argues that, although each lease began as one property, it has divided each lease into divisible properties in the form of operating mineral interests. These separated properties would generally still be treated as one property under section 614(b)(1), but for the election that Gulf contends was made and that allows it to maintain the division of the lease under section 614(b)(2). Respondent contends that the designations within each lease set forth by petitioner do not constitute operating mineral interests. Respondent argues that the general rule of section 614(a) applies and that petitioner has not demonstrated that any one of the leases contains more than one economic interest in a mineral deposit, and that each of the leases thus constitutes only one property.[4]

---

[4]During the course of a protracted and rancorous pretrial hearing, the parties stipulated that Gulf had elected to treat the horizontal strata bearing potential mineral deposits as operating mineral interests. We believe that the stipulated language does not reflect the common intention of the parties. *South Bay Corp. v. Commissioner*, 345 F.2d 698 (2d Cir. 1965). From the transcript, it is apparent that the parties agreed only that Gulf, itself, defined these strata as operating mineral interests and did not intend to stipulate to a conclusion of law in usurpation of this Court's function. *A.B.C.D. Lands, Inc. v. Commissioner*, 41 T.C. 840 (1964);

Regardless of whether the properties at issue consist of the potential mineral deposits within horizontal strata or the entire leases, deductibility of an abandonment loss under section 165 requires first that there be a commerciably reasonable determination of worthlessness. Petitioner's expert witness agreed that portions of each lease would not produce oil or gas in commercial quantities, but agreed with Gulf's determinations as to which deposits within horizontal strata were worthless only 3 times out of 12 in the MAFLA offshore area while his conclusions did not coincide with those of Gulf on any of the losses claimed for the offshore Louisiana area. He also would not have allocated the basis of the leases among the allegedly abandoned and retained portions of the leases in the same manner as did petitioner.

One of the leading cases setting forth the standards of reasonableness is *Harmon v. Commissioner*, 1 T.C. 40 (1942), affd. 139 F.2d 211 (10th Cir. 1943), revd. on other grounds sub nom. *Commissioner v. Harmon*, 323 U.S. 44 (1944). In that case, the experts for the taxpayer and respondent, all of whom were well qualified, gave conflicting testimony as to the probability of production of oil in commercial quantities. The royalty interests were disposed of by quitclaim deed in the year after the year for which the deductions were claimed. This Court stated that:

the possibility of the recovery of oil at some time in the future from some of the lower unexplored regions of petitioner's properties may be admitted. We do not think, however, that this mere "possibility" of future production is in itself sufficient to give value to oil royalties which have been condemned as worthless by those engaged in the trade and familiar with the development in those particular areas. * * * [1 T.C. at 58.]

This Court has grappled with the issue of abandonments of horizontal strata within leases in *Brountas v. Commissioner*, 73 T.C. 491, 582-587 (1979), affd. on this issue and revd. in part 692 F.2d 152 (1st Cir. 1982), affd. on this issue

---

*Yagoda v. Commissioner*, 39 T.C. 170 (1962), affd. 331 F.2d 485 (2d Cir. 1964), cert. denied 379 U.S. 842 (1964). Further, stipulations that are erroneous as contrary either to the facts or the law are not binding upon this Court. *Swift & Co. v. Hocking Valley Ry. Co.*, 243 U.S. 281 (1917); *King v. United States*, 641 F.2d 253 (5th Cir. 1981). In light of the history of the stipulation process in this case and in light of our finding below, we need not decide whether the horizontal strata are, by law, operating mineral interests or whether petitioner has effectively elected to treat the "operating mineral interests" as separate properties, as petitioner has failed to meet its initial burden of proving an act of abandonment.

and revd. in part sub nom. *CRC Corp. v. Commissioner*, 693 F.2d 281 (3d Cir. 1982).[5] In that case which dealt with abandonments of onshore leases, we stated:

Specifically, the timing of an abandonment loss depends on (a) the geological determination of worthlessness and (b) the payment of delay rentals.

\*     \*     \*     \*     \*     \*     \*

* * * We believe that a geological determination of total worthlessness, coupled with the objective cessation of the payment of delay rentals, establishes that a mineral lease has been abandoned. There may be other ways in which an act of abandonment could have occurred—such as delivery to the lessor of a legally binding instrument disclaiming further rights under the lease—but we need not decide this because there is no evidence here of any irrevocable, definitive act of abandonment prior to letting the delay rental due date lapse without payment.

On the other hand, regardless of whether a test well was a dry hole, if the partnerships continued to pay delay rentals for a particular lease, they were not entitled to claim an abandonment loss until there was an unequivocal act of abandonment such as letting a due date for such payments pass without payment. * * *

[73 T.C. at 584-585. Fn. ref. omitted.]

In the present case, petitioner continued to pay delay rentals on each of the leases at issue during each of the relevant taxable years. The delay rentals preserved petitioner's rights to the entire lease including the purportedly abandoned potential mineral deposits within horizontal strata. Petitioner has failed to prove any act evidencing its present declaration that these properties were worthless and abandoned in the taxable years at issue, whether the term property is defined as each of the potential mineral deposits or defined as the lease itself. Petitioner retained the right to drill and explore on all portions of each of the leases as evidenced by the continuation of its own efforts and its farmout of portions of the leases. Petitioner felt that at least one deposit within each lease had sufficient value to warrant the retention not only of legal title to the lease, but of all rights appurtenant thereto. Even if the issue of the payment of delay rentals were removed from consideration, there is no objective evidence of petitioner's claim that it abandoned any portion of the leases at issue during the

---

[5]The Third Circuit Court of Appeals is the court to which this case may be appealed and we are, therefore, bound by its decision in this issue. *Golsen v. Commissioner*, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971).

taxable years at issue. *A.J. Industries, Inc. v. United States, supra.*

The facts here show a clear failure on the part of petitioner to abandon the purportedly worthless property by the readily available method of the cessation of delay rentals.

it was improper to take abandonment losses for mere pieces of a leasehold. The law is clear. To be entitled to an abandonment loss, a taxpayer must show "an intention 'to abandon the property, coupled with an act of abandonment * * *' " *Massey Ferguson, Inc. v. Commissioner*, 59 T.C. 220, 225 (1972). Where "delay rentals" were no longer paid, the Tax Court found such an "act" and allowed the loss deduction. Where the taxpayer continued to pay "delay rentals," however, the Court found no such "act." * * *

* * * The mere determination that a stratum is worthless, even if made on the advice of geological experts, does not necessarily show abandonment. As long as the investors continued to pay the delay rentals, they had the right to test other strata and even the purportedly abandoned stratum. "In a case such as this it would be more reasonable to fix the date of worthlessness as being the date when the parties refused to pay further rents * * * "

[*Brountas v. Commissioner*, 692 F.2d at 162-163. Citations omitted.]

In *CRC Corp. v. Commissioner*, 693 F.2d 281 (3d Cir. 1982), the companion case to *Brountas*, the Third Circuit Court of Appeals also affirmed the opinion of this Court as to this issue:

The Tax Court held that so long as the investors continued to pay delay rentals they still had the right to explore all strata in the leasehold, and thus there was no "intention to abandon coupled with an act of abandonment." *Massey Ferguson, Inc. v. Commissioner*, 59 T.C. 220, 225 (1972). The *Brountas* court affirmed this finding.

* * * Detailed treatment by us of any of these issues would serve no useful purpose. It suffices to observe the Court of Appeals for the First Circuit properly disposed of the companion appeal arising out of the same trial record.

[693 F.2d at 283-284.]

Petitioner urges that its decision to take section 165 losses for the abandonment of a portion of the leases was reasonable, and that it took all possible actions to evidence that abandonment in light of the refusal of the Minerals Management Service to accept horizontal abandonments of mineral leases much less relinquishment of a mere deposit.

We agree that the "subjective judgment of the taxpayer * * * as to whether the business assets will in the future have value is entitled to great weight." *A.J. Industries, Inc. v. United States*, 503 F.2d at 670. Further, we are not requiring that petitioner sell or otherwise dispose of the properties before a claim of abandonment can be valid. *James Petroleum Corp. v. Commissioner*, 238 F.2d 678 (2d Cir. 1956), cert. denied 353 U.S. 910 (1957); *Gordon v. Commissioner*, 46 B.T.A. 1201 (1942), affd. 134 F.2d 685 (4th Cir. 1943). However, in order to claim a deduction under section 165, even a reasonable determination of worthlessness, as adjudged by a prudent and informed businessman standard, must be supported by an act of abandonment. *Harmon v. Commissioner*, 1 T.C. at 58. *Brountas v. Commissioner*, 73 T.C. at 585.

Gulf claims that relinquishment of legal title was virtually impossible as to individual deposits in the leases because of the policy of the Minerals Management Service prohibiting relinquishment of horizontal strata. Regardless of the propriety or legal standing of the attempt by Gulf to divide each lease into its component deposits, no affirmative act of abandonment occurred with respect to any potential mineral deposit or lease. Furthermore, petitioner concedes that at least one deposit in each lease warranted the continued payment of delay rentals that continued its rights to the entire lease. Petitioner's argument is self-defeating. Each lease, as a whole, retained sufficient value to petitioner in the taxable years at issue to warrant retention of purportedly worthless deposits and strata in order to retain rights to the strata bearing minerals in commercially producible quantities. Petitioner did not retain mere legal title to the allegedly abandoned potential mineral deposits by payment of the delay rentals. The payments preserved the full panoply of rights with respect to the entire lease, including the right to drill, explore, and produce from any portion of the lease whether allegedly abandoned or not. Gulf, in fact, continued the exploration and drilling process on the leases during the taxable years at issue and thereafter. The difficulty of severing a horizontal portion of a lease under Minerals Management Service regulations does not obviate the need to make an overt act of abandonment as to each

property, an act which Gulf did not make, whether the property is defined as the lease or as a deposit within a horizontal strata.

In light of our finding that petitioner has failed to prove that it sustained a loss with respect to abandoned properties in the offshore Louisiana or MAFLA offshore areas that would permit a deduction under section 165, we need not determine the amount of the allowable deduction. We decide the "Worthless Properties" issue for respondent.

This opinion resolves certain severed issues only, and all other issues not previously decided in this case[7] are still before the Court.

---

[7]Other issues in this docket have been decided as follows: the "Kuwait Nationalization" issue was decided by this Court in *Gulf Oil Corp. v. Commissioner,* 86 T.C. 937 (1986); the "Iranian Foreign Tax Credit" issue was decided by this Court in *Gulf Oil Corp. v. Commissioner,* 86 T.C. 115 (1986); and the "North Sea Farmout" issue was decided by this Court in *Gulf Oil Corp. v. Commissioner,* 84 T.C. 447 (1985).