PHILLIPS PETROLEUM CO. AND AFFILIATED SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Phillips Petroleum Co. v. Commissioner
Docket No. 34019-87
United States Tax Court
T.C. Memo 1991-257; 1991 Tax Ct. Memo LEXIS 300; 61 T.C.M. (CCH) 2836; T.C.M. (RIA) 91257; June 6, 1991, Filed *300 Because motions which were heard in this case remain before the Court for disposition (see supra note 1), no Order will be issued at this time. Stephen D. Gardner, Carolyn J. Schwarz, Ann-Elizabeth Purintun, and John Hartje, for the petitioner. Val J. Albright and Stephen C. Coen, and Martin Van Brauman, for the respondent. KORNER, Judge. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined the following deficiencies in petitioner's Federal income tax: Year
Deficiency  1975
$ 3,842,229.12
1976
14,706,626.78
1977
31,148,144.82
1978
45,755,365.67
The present issues for decision [1] are: (1) Whether petitioner erroneously claimed a worthless properties deduction in 1978 with regard to an oil and gas lease, and (2) whether petitioner erroneously claimed interest expense deductions in 1975 through 1978 with regard to certain Federal income tax deficiencies. For convenience, we will separately state our Findings of Fact and Opinion for each issue. *301 GENERAL FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of fact and exhibits attached thereto are incorporated herein by this reference. Petitioner is an affiliated group of corporations that filed consolidated Federal income tax returns for the years at issue. They maintained their books and filed the returns on the calendar year basis and according to the accrual method of accounting. Phillips Petroleum Company (hereinafter Phillips) was the common parent and a member of petitioner. It had its principal office at Bartlesville, Oklahoma, when the petition in this case was filed. During the years at issue petitioner was primarily engaged in the business of acquiring, exploring, developing, and operating oil and gas properties, and selling the production therefrom. Issue (1): Worthless Properties Deduction
FINDINGS OF FACT On October 27, 1977, a lease sale was held by the United States Department of the Interior, Bureau of Land Management. The sale, referred to as "Oil and Gas Lease Sale No. CI," was conducted pursuant to the Outer Continental Shelf Lands Act, 67 Stat. 462, 43 U.S.C. secs. 1331-1343 (1986). It offered, by *302 a competitive bidding process, oil and gas leases of offshore tracts adjacent to the State of Alaska. Phillips participated in this sale, submitted a number of bids, and was awarded several leases. Among these was a lease, Serial Number OCS-Y-0084, to a tract titled "Block 274" (a.k.a. Tract No. CI-8). Phillips' leasehold interest in Block 274 was full and undivided. Phillips paid a total $ 48,402,432 "lease bonus" on Block 274. It tendered one-fifth of this amount ($ 9,680,486.40) when it submitted its bid on October 27, 1977. Phillips paid the remaining $ 38,721,945.60 on or about November 28, 1977. The lease commenced on December 1, 1977. It was for a 5-year term, and so long thereafter as oil or gas was produced from the tract in "paying quantities," or certain drilling or well reworking operations were conducted. Phillips agreed to pay, on or before the first day of each lease year, "delay rentals" of $ 8.00 per hectare, or $ 18,432, [2] for each lease year commencing prior to a discovery of oil or gas. The lease provided that Phillips may surrender the "entire lease or any officially designated subdivision of the leased area" by a written filing. Phillips held the *303 lease until it expired on December 1, 1982. It made delay rental payments on or before December 1st of each of the 5 lease years (1977-81). Block 274 was located in the Lower Cook Inlet of Alaska. As of the October 1977 lease sale, no oil or gas had been produced in that area, and much was unknown about its geology. It was considered to be a "wildcat" area, and to have expensive operating costs. There had, however, been substantial oil and gas production in the contiguous Upper Cook Inlet and its adjacent onshore areas. In preparing its bid on Block 274, Phillips personnel consulted and prepared multiple studies and tests of the area. These included seismic information, economic analyses, and assessments of potential oil and gas structures and reserves. Also consulted were data collected from the three offshore wells which had previously been drilled (and plugged) in the Lower Cook Inlet. These wells had been located at distances approximately 10-20 miles from Block 274's *304 location. Phillips personnel identified several potential oil and gas bearing structures. One of these, the "West Anchor Prospect," covered portions of four blocks, [3] including Block 274. The West Anchor Prospect was a large anticlinal structure bisected by a fault. The fault ran through Block 274. Anticlinal structures are considered to bear potential oil and gas reserves because they contain the type of trap in which oil and gas may accumulate. Following the lease sale, in July 1978, Phillips entered into a "Joint Exploration Agreement" with other companies which held lease interests in the West Anchor Prospect. The agreement designated a "Joint Exploration Area," which included a southeastern portion of Block 274. Pursuant to the agreement, the parties cosponsored an exploratory well, identified as "Marathon OCS-Y-0086 Well #1" (the Marathon Well), in the northeast corner of Block 318. Block 318 was the block immediately *305 south of Block 274, and the Marathon Well was located approximately 500 feet from Block 274. It was believed that this well would test the "upthrown" or eastern side of the fault which ran through the West Anchor Prospect and Block 274. The Marathon Well was spudded on July 21, 1978. It reached a total depth of 13,315 feet on or about November 27, 1978. The well was plugged and abandoned on or about December 27, 1978. The data received from the Marathon Well was unfavorable. Although certain amounts of oil and gas were encountered, no commercial deposit was found. A December 15, 1978, press release publicly stated the well's results, and that it was being plugged and abandoned. Petitioner claimed a total $ 36,301,824 worthless properties deduction on its 1978 consolidated Federal income tax return. As part of that return, petitioner filed three Forms 927, "Proof of Worthlessness of Mineral Rights." The following three "properties" and their "costs" were identified on the forms: PROPERTY COST W. Anchor A - 274T
$ 19,360,972.80
W. Anchor A - 274LK
7,260,364.80
W. Anchor A - 274UJ
9,680,486.40
The forms stated that the entire costs of the properties were allocated *306 to mineral rights. They also stated that title to the properties had not been disposed of, and that the properties had not been offered for sale. In response to a request for information regarding developments on the properties or within one mile, as well as any mineral production thereon, the forms provided the following statement: "Exploratory Dry Hole drilled on adjacent tract (Well O.C.S. Y-0086 #1)." This was a reference to the Marathon Well. No other details were provided; instead, the forms referenced to "Information in taxpayer's files." The "properties" identified on the Forms 927 were actually references to horizontal subsurface strata in the same tract, identified by their geologic eras. Petitioner had previously, on its 1977 consolidated tax return, attached a document entitled "Election to Treat Separate Operating Mineral Interests in Single Tracts as Separate Properties." That document stated that, pursuant to Reg. section 1.614-8(a)(3)ii (sic), it was identifying separate operating mineral interests within the same tracts or parcels of land. Among these tracts was Block 274, and the "interests" identified therein were "274-T," "274-UK," "274-LK," and "274-UJ." *307 These abbreviations referred to Tertiary, Upper Cretaceous, Lower Cretaceous, and Upper Jurassic strata, respectively. Phillips based this division of Block 274 upon available geological and geophysical information, including data from the three offshore wells which had been drilled in the Lower Cook Inlet prior to the lease sale. Results from the Marathon well supported the presence of the four strata in Block 274. Phillips figured the "costs" of the strata listed on its 1978 Forms 927 based upon an allocation of the lease bonus that it had paid on Block 274. It based its allocation of the lease bonus between the strata upon its estimates of the oil and gas reserves in each strata. [4]
On or about February 20, 1979, Phillips received a notification that, unless the parties agreed to drill a subsequent well, the Joint Exploration Agreement would terminate. *308 No such agreement was reached. On or about March 13, 1979, Phillips received a letter stating that the Joint Exploration Agreement had, by its terms, terminated upon the plugging and abandonment of the Marathon Well, conditioned upon a settlement of all accounts. Interoffice correspondence and other documents indicate that Phillips had been contemplating drilling a well on Block 274. A chart entitled "Time Schedule for Lower Cook Inlet Drilling Operations," dated August 10, 1978, stated that a well on Block 274 was scheduled for January 1980. A November 30, 1978, interoffice memorandum mentions, inter alia, that an exploratory drilling plan for certain wells had been approved. The prospective wells included one on Block 274, referred to as "West Anchor No. 2." By a letter dated January 3, 1979, Phillips submitted to the District Engineer, United States Army Engineer District, a revised schedule for drilling certain Lower Cook Inlet wells, including West Anchor No. 2. The revised schedule stated that the drilling would be commenced on or about April 15, 1980, and be completed by October 1, 1980. West Anchor No. 2 remained listed as part of Phillips' "original drilling program *309 plan" in an interoffice correspondence dated June 13, 1979. This correspondence came out of Phillips' Colorado office. It was addressed to Mr. W. T. Evans, Phillips' Alaska Area Exploration Manager, and stated that "Our plans are to continue with this [drilling] program and to request permits, purchase casing, etc., * * * If there is any change in this program from an exploration standpoint, we need as much advance notice as possible." A June 21, 1979, interoffice memorandum signed by Mr. Evans responded to the June 13 correspondence as follows: "In response to your letter of June 13, 1979, we hereby advise that the Alaska Exploration Section does not intend to recommend drilling the West Anchor OCS Y-0084 #2, Block 274. Results of the Marathon Well in the adjacent OCS Block #318 have discouraged further drilling on this structure at this time." During October 1979, Phillips "shot" (or had shot) seismic lines in the Cook Inlet. Seismic lines are used to evaluate subsurface structures. Two of these lines were shot across Block 274. On or about November 13, 1979, Phillips authorized an expenditure to "record and process approximately 250 miles of CRP seismic data" for "Upper *310 Cook Inlet, Alaska." This expenditure included the seismic lines shot across Block 274. These lines were processed in January 1980. On March 5, 1980, Phillips' Kenai, Alaska, office received a letter from the United States Department of the Interior, Geological Survey Conservation Division. The letter requested information regarding future plans for undrilled leases in the Lower Cook Inlet. In response, by a letter dated March 17, 1980, Phillips made the following statement with regard to its lease on Block 274: In an attempt to evaluate this lease, Phillips Petroleum Company gave considerable financial support (24%) to Marathon Oil Company's 13,315', January, 1979 exploratory test which was drilled immediately adjoining the southeast corner of our lease. Subsequent to the drilling of this well, Phillips conducted a short seismic program over our lease in the summer of 1979. Evaluation of the new seismic continues. After discussing other leases in particular, the letter concludes as follows: In summary, Phillips Petroleum Company purchased seven (7) leases in the 1977 Lower Cook Inlet OCS sale. Since then, we have completed the drilling of two exploratory wells, in *311 addition to furnishing considerable financial support to the drilling of two other exploratory wells. We are currently nearing completion of a third Phillips operated well. We feel that Phillips has put forth a diligent effort in evaluating its leases acquired in the Lower Cook Inlet. Our future plans will await the outcome of current drilling operations, a review of previously drilled wells, and the evaluation of new seismic data now in our data base. On April 24, 1980, Phillips made a payment of $ 5,201.70 to the United States Geological Survey, Conservation Division. The payment was for an assessment made under the Fishermen's Contingency Fund relative to offshore oil and gas leases in the Lower Cook Inlet. These leases included Block 274. An October 8, 1980, Phillips interoffice memorandum, referencing "Lease Impairment Report Lower Cook Inlet Leases," made the following statements with regard to the Marathon Well, Block 274, and West Anchor Prospect: We drilled one well, the OCS-Y-0086 #1 on Block 318 under a Joint Exploration Agreement. * * * A small amount of 30 degrees gravity oil was recovered from an upper cretaceous sand. The well encountered the upper Jurassic *312 and was abandoned. We desire to retain our lease in this area in view of the possibility of further drilling by others in the area. An October 23, 1980, interoffice memorandum contains the following statement: Some oil was recovered from Cretaceous sands in the Marathon operated OCS Y-0168 #1 (Block #318). This well offsets our Block #274 on which we have seismically defined a separate structure on the downside of a significant fault. We plan to promote additional drilling on Block #274. With regard to delay rentals due pursuant to Phillips' Lower Cook Inlet oil and gas leases, the October 23, 1980, memorandum continues: Rentals are approximately $ 18,400 for each 5,760 acre lease, for a total of $ 110,400 net to Phillips and are due on December 1st. For the following specific reasons, we recommend paying these rentals on all leases: a) untested stratigraphic potential of the Cretaceous, b) the oil shows from the Marathon well and reported oil recoveries from an Arco well located 15 miles to the southwest, c) the untested structure on Block #274, and, d) reports of future drilling activity by Arco and possibly by Exxon in Lower Cook Inlet. Recognizing *313 that other Corporate Divisions may wish E&P to take the tax write-off at this time, we suggest that, while recommending retention of the leases, a minimum position at the other extreme would be to maintain our interest in Block #274, and release our interest in all remaining leases. As stated above, Phillips made delay rental payments, pursuant to its lease of Block 274, for each of the 5 lease years. It held the lease until it expired on December 1, 1982. Phillips never drilled on Block 274. Neither did it "farm out" its drilling rights thereon to another party. In his notice of deficiency, respondent disallowed petitioner's 1978 worthless properties deduction in full. OPINION 1. Expert Testimony Both petitioner and respondent presented expert testimony with regard to the information and occurrences underlying the item at issue. Petitioner's expert and respondent's experts were accepted by the Court as qualified to testify as to the subject matters for which their testimony was offered. Petitioner's expert, the consulting firm of DeGolyer and MacNaughton, was represented by Vernon E. Pringle, Jr., a senior vice president. DeGolyer and MacNaughton's report contained *314 the following statements: ."After reviewing the data that were available in October 1977, it is our opinion that sufficient data were available to estimate the relative exploratory potential of the Tertiary, Upper Cretaceous, Lower Cretaceous, and Jurassic horizons in the vicinity of Block 274." ."On the basis of our review of the data available in October 1977, we estimate that the exploratory potential of the four horizons under Block 274, should have been allocated, as of October 1977, 50 percent to the Tertiary, 30 percent to the Upper Cretaceous, 15 percent to the Lower Cretaceous, and 5 percent to the Jurassic." The report calls such estimates "necessarily subjective." At trial Mr. Pringle testified that, "given the subjective nature of these type of estimates," petitioner's allocation between the strata (which differed from DeGolyer and MacNaughton's, see note 4, supra) was "reasonable." ."Based on the seismic interpretation provided by Phillips, the Block 318 well was drilled at a near optimum structural position to evaluate all of the horizons of the structure comprising the West Anchor prospect. The absence of either hydrocarbons and/or reservoir quality sandstone *315 in any of the horizons at the well's location near the crest of the structure could effectively condemn the exploratory potential of that horizon. The seismic interpretation provided by Phillips also indicates the presence of a separate smaller structure, located to the west of the fault under Block 274, having structural closure of relatively small areal extent under the northwest corner of Block 274. Although there is a possibility that oil or gas accumulations could occur in that smaller structure, the potential volume of such accumulations under the northwest portion of Block 274 is minor in comparison to the potential volumes of accumulations under the remainder of Block 274 that could have occurred in the structure on which the Block 318 well is located." [Figure ref. omitted.] ."* * * it is our opinion that the data available at year-end 1978 are sufficient to condemn the exploratory potential previously estimated for the Tertiary, Upper Cretaceous, Lower Cretaceous, and Jurassic horizons under Block 274." At trial Mr. Pringle made it clear that this conclusion applied both to the "downthrown" (or western) and "upthrown" (or eastern) sides of the fault that ran through Block *316 274. Respondent presented the testimony of two expert witnesses. A report prepared by Gruy Engineering Corporation takes the following positions: ."The subdivisions designated by Phillips are not oil or gas reservoirs, which would constitute mineral deposits as the term is used in the petroleum industry, but are very broad time-stratigraphic units used to designate all rocks deposited during these geologic time periods. The division of a lease into different mineral deposits based upon the various time-stratigraphic units is not normally, if ever done, in the petroleum industry prior to the establishment of production. In determining its bid for Block 274, Phillips made estimates of the potential reserves which they felt could lie beneath Block 274 in some of these time-stratigraphic units. These estimates, however, are very subjective, based upon several broad based assumptions and in our opinion can not be construed as designating value or to reflect with any degree of accuracy what exists in the subsurface prior to drilling a well on the lease. This is especially true in an area like the lower Cook Inlet where very little drilling and no production existed prior to the *317 lease sale." ."The drilling of the Marathon well did diminish the value of the Block 274 lease, but did not make worthless the potential of all zones other than the Upper Cretaceous. There is a separate untested structure, acknowledged by Phillips, which is separated from the structure penetrated by the Marathon well by a significant fault. Any of the time-stratigraphic units that contained reservoir quality rock would have the potential of being productive in a well drilled in the northwest quarter of Block 274. * * * Although the Marathon well did encounter a significant show in the Upper Cretaceous, the sandstone was not of reservoir quality. However, a well drilled further to the northwest toward the sediment source and downthrown to a major fault would have a higher potential of encountering reservoir quality rock in the Upper Cretaceous section, as well as, in the underlying Lower Cretaceous sections." [Figure ref. omitted.] The report presented by respondent's other expert reaches similar conclusions. 2. Legal Analysis Petitioner's 1978 worthless properties deduction raises a number of potential issues for decision. At trial and on brief the parties disagreed *318 as to: (a) The validity of petitioner's 1977 attempted election to treat "separate operating mineral interests" in Block 274 as separate properties; (b) whether petitioner was entitled to its claimed worthless properties deduction under section 165; and (c) whether petitioner properly allocated its lease bonus between the identified strata in Block 274. Petitioner bears the burden of proof as to each of these issues. Rule 142(a). Because we hold that petitioner did not carry its burden with regard to issue (b), regardless of whether or not its 1977 election was valid, we need not, and do not, address issues (a) and (c). To be allowable, petitioner's claimed worthless properties deduction must qualify under section 165. Section 165(a) allows as a deduction "any loss sustained during the taxable year and not compensated for by insurance or otherwise." In general, a deductible loss is sustained "during the taxable year in which the loss occurs as evidenced by closed and completed transactions and as fixed by identifiable events occurring in such taxable year." Sec. 1.165-1(d)(1), Income Tax Regs.Section 1.165-2, Income Tax Regs., applies and supplements this rule, with regard to *319 nondepreciable property: Sec. 1.165.2. Obsolescence of nondepreciable property. -- (a) Allowance of deduction. A loss incurred in a business or in a transaction entered into for profit and arising from the sudden termination of the usefulness in such business or transaction of any nondepreciable property, in a case where such business or transaction is discontinued or where such property is permanently discarded from use therein, shall be allowed as a deduction under section 165(a) for the taxable year in which the loss is actually sustained. For this purpose, the taxable year in which the loss is sustained is not necessarily the taxable year in which the overt act of abandonment, or the loss of title to the property, occurs. Sustained losses deductible under this section have commonly been referred to as abandonment losses. In order to be entitled to an abandonment loss, a taxpayer "must show an intention to abandon the property, coupled with an act of abandonment, both of which must be ascertained from all of the surrounding facts and circumstances." Massey-Ferguson, Inc. v. Commissioner, 59 T.C. 220, 225 (1972), quoting in part Boston Elevated Railway Co. v. Commissioner, 16 T.C. 1084, 1108 (1951), *320 affd. 196 F.2d 923 (1st Cir. 1952); see also Gulf Oil Corp. v. Commissioner, 914 F.2d 396, 402 (3d Cir. 1990), affg. 87 T.C. 135 (1986), citing A. J. Industries, Inc. v. United States, 503 F.2d 660 (9th Cir. 1974). Furthermore, deductibility of an abandonment loss requires that there be a commercially reasonable determination of worthlessness. Gulf Oil Corp. v. Commissioner, 87 T.C. 135, 160 (1986), affd. 914 F.2d 396 (3d Cir. 1990). These tests are not unrelated. As we stated in Gulf: "in order to claim a deduction under section 165, even a reasonable determination of worthlessness, as adjudged by a prudent and informed businessman standard, must be supported by an act of abandonment." 87 T.C. at 163 (citations omitted). We have previously applied these standards to the issue of abandonments of horizontal strata within mineral leases. Gulf Oil Corp. v. Commissioner, supra; Brountas v. Commissioner, 73 T.C. 491, 582-587 (1979), affd. on this issue and revd. in part 692 F.2d 152 (1st Cir. 1982), affd. on this *321 issue and revd. in part sub nom. CRC Corp. v. Commissioner, 693 F.2d 281 (3d Cir. 1982). In Brountas we stated: Specifically, the timing of an abandonment loss depends on (a) the geological determination of worthlessness and (b) the payment of delay rentals. * * * We believe that a geological determination of total worthlessness, coupled with the objective cessation of the payment of delay rentals, establishes that a mineral lease has been abandoned. There may be other ways in which an act of abandonment could have occurred -- such as delivery to the lessor of a legally binding instrument disclaiming further rights under the lease -- but we need not decide this because there is no evidence here of any irrevocable, definitive act of abandonment prior to letting the delay rental due date lapse without payment. On the other hand, regardless of whether a test well was a dry hole, if the partnerships continued to pay delay rentals for a particular lease, they were not entitled to claim an abandonment loss until there was an unequivocal act of abandonment such as letting a due date for such payments pass without payment. * * * [73 T.C. at 584-585. *322 Fn. ref. omitted.] We reaffirmed and applied these standards in our Gulf opinion. 87 T.C. at 160-164. We hold them applicable to the present case as well. Having considered all the facts and circumstances of this case, as well as the expert testimony presented, we hold that respondent correctly disallowed petitioner's claimed worthless properties deduction. Petitioner has not carried its burden to prove an abandonment loss in 1978. We point out that this conclusion, and our reasoning stated below, apply equally to Block 274 as a whole, and the three strata which were the subject of petitioner's attempted deduction. As stated above, this fact obviates the need to further discuss that filing, or any basis allocation made pursuant thereto. Petitioner has simply failed to prove the requisite "affirmative and irrevocable" act of abandonment. See Brountas v. Commissioner, 73 T.C. at 587. Petitioner's actions and expressions with regard to Block 274 were equivocal, perhaps reflecting an intracorporate ambivalence. It continued to pay delay rentals, and thus clearly did not abandon the lease itself. Neither did petitioner prove any affirmative *323 act of abandonment with regard to the three "worthless" strata. As the Third Circuit stated in its Gulf opinion: "Merely abandoning the strata or leases on paper because they are deemed worthless is insufficient to demonstrate abandonment for purposes of an I.R.C. § 165 loss deduction." 914 F.2d at 402, citing Beus v. Commissioner, 261 F.2d 176, 180 (9th Cir. 1958). We have considered petitioner's arguments on these points, and must reject them. Firstly, petitioner argues that it had no choice but to continue to pay delay rentals, because Government regulations applicable to offshore leases prevented it from surrendering the "worthless" strata without also forfeiting its rights to the Upper Cretaceous horizon, which it believed to be of continuing value. Thus, argues petitioner, its retention of "bare legal title" should not prevent its deduction. We considered this same argument in Gulf. The conclusions that we reached in that case are equally applicable here. We quote: Petitioner did not retain mere legal title to the allegedly abandoned potential mineral deposits by payment of the delay rentals. The payments preserved the full *324 panoply of rights with respect to the entire lease, including the right to drill, explore, and produce from any portion of the lease whether allegedly abandoned or not. * * * The difficulty of severing a horizontal portion of a lease under Minerals Management Service regulations does not obviate the need to make an overt act of abandonment as to each property, an act which Gulf did not make, whether the property is defined as the lease or as a deposit within a horizontal strata. [87 T.C. at 163-164.] While we recognize that Gulf did, in fact, conduct exploration and drilling on the leases at issue in its case during the taxable years at issue and thereafter, this does not affect the applicability of our reasoning in that case to the present matter. Like Gulf, Phillips retained its full panoply of rights under the lease by paying the delay rentals. This fact alone suffices to rebut petitioner's "bare legal title" argument. Phillips could have, at any time during the lease term, explored and drilled on any portion or stratum of Block 274. [5] As for the difficulties associated with severing horizontal portions of a lease, we defer this matter to those deemed to *325 have the expertise to decide whether such a separation is appropriate. We can merely assess petitioner's actions (or inactions). It is beyond our task to determine whether petitioner was presented with an appropriate spectrum of alternatives. Petitioner also argues that the requirement of an overt act of abandonment is legally erroneous. In support, petitioner cites the final sentence of section 1.165-2(a), Income Tax Regs., which states that: * * * the taxable year in which the loss is sustained is not necessarily the taxable year in which the overt act of abandonment, or the loss of title to the property, occurs. We cannot agree. While it is unquestioned that the year in which an act of abandonment occurs is not, in all cases, the year in which a loss is sustained, this insight speaks to exceptional, limited circumstances. See A. J. Industries, Inc. v. United States, 503 F.2d 660, 668-670, n. 6b (9th Cir. 1974). *326 Such circumstances are not currently present. [6] As a result, the general rule that petitioner must prove an affirmative act of abandonment applies in this case. As stated, petitioner failed to carry this burden, and we accordingly hold for respondent on this issue (1). Issue (2): Interest Expense Deduction
FINDINGS OF FACT During and for the taxable years 1970 through 1978, Phillips was the common parent of an affiliated group of corporations that filed consolidated Federal income tax returns. Although there were some membership changes in that group over *327 the years, it remained in existence during the years 1970 through 1978. (For the sake of convenience, Phillips and its affiliated corporations which filed consolidated Federal income tax returns for 1970 through 1974 will also be referred to herein as petitioner.) During and for the taxable years 1970 through 1978, petitioner maintained its books and filed its consolidated Federal income tax returns according to the accrual method of accounting. Respondent audited petitioner's returns for each of the years 1970 through 1978. These audits were conducted via four separate audit cycles: 1970-72, 1973-74, 1975-76, and 1977-78. Each audit followed similar procedures. Respondent's agents would review petitioner's books and records, and meet with its tax officer and assistants. Following consultations, respondent would issue Forms 5701, Notices of Proposed Adjustments. Each Form 5701 addressed a single adjustment. Over the course of the 1970-78 audits, hundreds of these forms were issued to petitioner. The Notices of Proposed Adjustment were printed in triplicate. Respondent retained one copy, and sent two to petitioner: one for its files, and the other for correspondence. The *328 forms detailed the proposed adjustments and, in the lower left-hand corner, contained boxes in which petitioner could indicate that it: a) agreed; b) agreed in part; c) disagreed; or d) had additional information to submit with regard to the proposed adjustment. Petitioner did not check any of the boxes on any of the Forms 5701. It acknowledged receipt of these forms by stamping and returning the correspondence copy to respondent. Eventually, respondent's agents filed "revenue agent reports" (RAR's), detailing their audit results. Petitioner was routinely furnished a copy of these reports. The RAR's proposed numerous adjustments to specific items in petitioner's consolidated returns. The contents of these reports became the basis of Letters 950(DO) (commonly known as 30-day letters), which petitioner received for each of the years 1970-78. The 30-day letters were dated as follows: Years 30-day Letter Date
1970, 1971, 1972
October 26, 1982
1973, 1974
January 14, 1983
1975, 1976
April 27, 1984
1977, 1978
May 6, 1985
*329 Petitioner timely filed formal written protests to each of the 30-day letters. The protest letters for each of the cycles were dated as follows: Cycle  Protest Letter Date
1970-72
November 23, 1982
1973-74
February 11, 1983
1975-76
May 25, 1984
1977-78
July 3, 1985
These protest letters discussed some, but not all, of the proposed adjustments for the years involved. With regard to the remaining items, the letters were silent. Each of petitioner's protests was considered by respondent's Appeals Office in Oklahoma City, Oklahoma. With regard to the 1970 through 1972 cycle, the disputed liabilities were resolved by settlement at the appeals level. On June 13, 1983, petitioner executed a Form 866, Agreement as to Final Determination of Tax Liability, for its taxable years 1970, 1971, and 1972. Prior to June 13, 1983, petitioner had not executed, or offered to execute, any written agreement or authorization which would have permitted respondent to assess any part of the income tax deficiencies (and/or interest thereon) proposed by the RAR's for 1970, 1971, and/or 1972. Previously, during the course of respondent's examination of petitioner's 1970 through 1972 returns, petitioner filed Forms 1120X, Amended U.S. Corporation Income Tax Returns, with regard to each of those years. Each Form 1120X was dated June 20, 1980. The 1970 amended return claimed, inter alia, an aggregate net reduction in taxable income of $ 22,087,322, and sought a refund *330 of $ 9,629,155. The 1971 amended return claimed, inter alia, an aggregate net reduction in taxable income of $ 2,068,532, and sought a refund of approximately $ 908,220. The 1972 amended return claimed, inter alia, an aggregate net reduction in taxable income of $ 81,148,146, and sought a refund of approximately $ 34,719,188. Each of these amended returns took into consideration petitioner's estimates of additional taxes it would owe as a result of respondent's examinations. Each of the claimed refunds was denied by respondent. With regard to the 1973-74 cycle, after negotiations at the appeals level, petitioner signed a Form 870-AD, Offer of Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and of Acceptance of Overassessment. Petitioner executed this form on September 14, 1983. Prior to September 14, 1983, petitioner had not executed, or offered to execute, any written agreement or authorization which would have permitted respondent to assess any part of the income tax deficiencies (and/or interest thereon) proposed by the RAR's for 1973 and/or 1974. On December 19, 1983, petitioner filed amended returns for its taxable years 1973 and 1974. The 1973 *331 amended return claimed, inter alia, an aggregate net reduction in taxable income of $ 330,817, and sought a refund of $ 142,266.99. The 1974 amended return sought a refund of $ 268,961.60. Petitioner also executed Forms 870-AD with regard to the 1975-76 and 1977-78 audit cycles. Petitioner executed each of these forms on November 7, 1986. Prior to November 7, 1986, petitioner had not executed, or offered to execute, any written agreement or authorization which would have permitted respondent to assess any part of the income tax deficiencies (and/or interest thereon) proposed by the RAR's for 1975, 1976, and/or 1977. The parties did not settle all the items for 1975 through 1978 at the appeals level. A notice of deficiency was issued with regard to these years, which served as a basis of the current case. On their petition filed herein, petitioner claimed interest expense deductions for 1975 through 1978 with regard to "uncontested deficiencies" for 1970 through 1977. The petition explains as follows: W. Interest on Uncontested Deficiencies
(i) Petitioners' federal income tax returns for various taxable years from 1970 through and including 1977 were the subject of audits *332 by the Internal Revenue Service; (ii) As a result of such audits, the Internal Revenue Service proposed various adjustments to Petitioners' tax liability for such taxable years; (iii) Petitioners timely protested certain of the proposed adjustments; (iv) Petitioners did not protest, and performed no other affirmative act denying the validity of, the remaining adjustments; (v) No dispute has ever existed as to Petitioners' liability for taxes attributable to such unprotested adjustments; (vi) In each of the taxable years 1975, 1976, 1977 and 1978, interest accrued on Petitioners' unpaid income tax liability for previous years attributable to such unprotested adjustments; and (vii) In each such taxable year, all the events had occurred which determined the fact of Petitioners' liability for such interest, and the amount thereof could be determined with reasonable accuracy. (viii) Therefore, Petitioners are entitled to deductions for interest expense accrued with respect to unprotested adjustments to their federal income tax liability in the amounts of $ 1,874,075.00, $ 2,028,451.00, $ 2,560,805.00 and $ 2,654,290.00 for the taxable years 1975, 1976, 1977 and 1978, respectively. *333 [7]
Respondent contests these deductions in full. OPINION The present issue for decision raises a question of tax accounting. Petitioner contends that it is entitled to the asserted deductions because, as an accrual basis taxpayer, it had properly accrued those expenses. Respondent argues that petitioner did not qualify for the deductions in the years claimed. Petitioner bears the burden of proof on this matter. Rule 142(a). For the reasons stated below, we agree with respondent. Section 461(a) states that the amount of any deduction shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income. For the years at issue, an accrual method taxpayer is entitled to a deduction when the following "all events" test is met: Taxpayer using an accrual method. Under an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred *334 which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy. * * * the fact that the exact amount of the liability which has been incurred cannot be determined will not prevent the accrual within the taxable year of such part thereof as can be computed with reasonable accuracy. * * * [Sec. 1.461-1(a)(2), Income Tax Regs.] The Supreme Court has given this general rule particular application in two cases regarding contested liabilities. In Dixie Pine Products Co. v. Commissioner, 320 U.S. 516, 88 L. Ed. 270, 64 S. Ct. 364 (1944), the Court stated that a liability for a tax cannot be deducted when it "is contingent and is contested by the taxpayer." 320 U.S. at 519 (Fn. ref. omitted). In Security Flour Mills Co. v. Commissioner, 321 U.S. 281, 88 L. Ed. 725, 64 S. Ct. 596 (1944), the Court reiterated: It is settled by many decisions that a taxpayer may not accrue an expense the amount of which is unsettled or the liability for which is contingent, and this principle is fully applicable to a tax, liability for which the taxpayer denies, and payment whereof he is contesting. * * * [321 U.S. at 284. fn. ref. omitted.] *335 Since the Supreme Court decisions in Dixie Pine Products and Security Flour Mills, there have been many cases involving the issue of whether an accrual basis taxpayer was in fact contesting a tax liability. See, e.g., Hollingsworth v. United States, 215 Ct. Cl. 328, 568 F.2d 192 (1977); Lutz v. Commissioner, 45 T.C. 615 (1966), revd. 396 F.2d 412 (9th Cir. 1968); Great Island Holding Corp. v. Commissioner, 5 T.C. 150 (1945); cf. sec. 461(f). Ultimately, a determination must be made, based upon a consideration of all the facts and circumstances. The present issue presents a specific question within this area of the law: whether petitioner's "unprotested adjustments" were "contingent and contested," or whether its liabilities for these items were "settled," and their amounts could be "determined with reasonable accuracy." Having considered the documentary evidence and testimony on this matter, we conclude that petitioner's "unprotested adjustments" were not sufficiently settled to allow petitioner to acrue attendant interest expense deductions on its 1975 through 1978 returns. At any *336 time during the audit cycles petitioner could have agreed to the proposed adjustments; it did not. It retained its complete rights to protest these adjustments up until the days that it signed the Forms 886 and 870-AD. While it is true that a liability can, at any time, be protested or conceded (within applicable statutes of limitation), a line must be drawn between settled and contested liabilities. In this case we hold that the proposed adjustments were sufficiently challenged by petitioner's nonacquiescence to render them contested. Stated otherwise, there is nothing in this record to show that petitioner conceded any of respondent's proposed adjustments prior to the time the waivers were filed for the respective years. Petitioner disagrees. It argues that, in order for a contest to exist under the Dixie Pine Products line of cases, affirmative steps (beyond what it did) are required to challenge an asserted liability. We addressed this argument in General Communication Co. v. Commissioner, 33 T.C. 640 (1960), wherein we stated that: The taxpayer has the burden of proving that the asserted liability was in fact uncontested. The presence of an *337 admission, express or implied, serves as direct proof that the taxpayer was not contesting liability. But absence of an admission, while not conclusive proof of a contest, certainly leaves a gap in petitioner's proof in the circumstances of this case. A taxpayer may resist payment of an asserted claim in more subtle ways than express denial of liability or adoption of a litigious attitude. * * * [33 T.C. at 654. Fn. ref. omitted.] We do not construe petitioner's lack of an explicit protest with regard to certain of respondent's adjustments to be the equivalent of an implied admission of liability. As stated, petitioner preserved its rights to protest all the proposed adjustments up until the days it signed agreements to the contrary. We are unpersuaded that petitioner, a knowledgeable and sophisticated taxpayer, was either unaware of the options it preserved, or had no motive behind their preservation. Under these circumstances we are compelled to hold, as we did in General Communication Co., that petitioner has not carried its burden to prove that the asserted liabilities were in fact uncontested. We accordingly hold for respondent on this issue (2). *338 Because motions which were heard in this case remain before the Court for disposition (see supra note 1), no Order will be issued at this time. Footnotes
1. Pursuant to Rules 61(b) and 141(b), this case has been severed into component parts. We have previously issued one Opinion, Phillips Petroleum Co. v. Commissioner, 92 T.C. 885 (1989), and other claims remain to be heard. The present issues were tried on April 30, 1990. Cross-motions for partial summary judgment on other, unrelated issues were also heard on that date. This Opinion addresses only the fully tried issues herein described. All statutory references are to the Internal Revenue Code as in effect for the years in issue, except as otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Block 274 contained 2,304 hectares.↩
3. Each lease block was square, with each side having a length of approximately three miles.↩
4. The following allocation was used: ↩
Geologic Formation
% Reserves Assigned Tertiary
40
Upper Cretaceous
25
Lower Cretaceous
15
Upper Jurassic
20
5. Furthermore, the record indicates that a certain amount of seismic evaluation of Block 274 did occur in 1979.↩
6. It is arguable that, if the three "worthless" strata were indeed worthless in 1978, petitioner might be in a position to claim such exceptional circumstances. See A. J. Industries v. United States, 503 F.2d 660, 668↩ (9th Cir. 1974). We are not persuaded, however, on the record before us, that the three strata were without value or a reasonable expectation of value in 1978, or were considered to be such by petitioner at that time.
7. Petitioner referred to itself as "Petitioners" in its petition.↩